Donald R. PARKER, et al.

v.

DISTRICT OF COLUMBIA, Appellant.

No. 87–7039.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 16, 1987.

Decided June 17, 1988.

---

Donna M. Murasky, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief for appellant.

William W. Taylor, III, with whom Roger E. Zuckerman and Christine Nicholson, Washington, D.C., were on the brief for appellees. Michael R. Smith, Washington, D.C., also entered an appearance for appellees.

Before MIKVA and WILLIAMS, Circuit Judges, and GORDON,* Senior District Judge.

Opinion for the Court filed by Senior District Judge MYRON L. GORDON.

Dissenting Opinion filed by Circuit Judge WILLIAMS.

MYRON L. GORDON, Senior District Judge:

Don R. Parker sustained serious injuries after being shot by an officer of the District of Columbia metropolitan police department Repeat Offenders Project [ROP]. This is an appeal from a judgment based upon a jury verdict that awarded Mr. Parker $425,046.67 in damages and nominal loss of consortium damages to his wife, Betty. The Parkers sued the District of Columbia and the ROP officers involved; they alleged state law assault and battery and violations of 42 U.S.C. § 1983 arising out the District's failure adequately to train, discipline and supervise its ROP officers in matters of extrajurisdictional arrest

and disarmament. Prior to trial, the Parkers dropped their claims against the individual officers and proceeded only against the District.

At the close of all the evidence in the trial, the court denied the District's motion for a directed verdict. The case went to the jury, which found in favor of the District on the state law claims, but against the District with respect to the section 1983 claim. The District moved for judgment notwithstanding the verdict, but the court denied this motion. The District now challenges the court's ruling on the motion for judgment n.o.v. and aspects of the charge tendered to the jury. For the reasons set forth below, we affirm.

## I. BACKGROUND

This case is the result of confusion and a series of mistakes leading to tragic consequences. On the morning of November 15, 1982, two ROP officers, William Hayes and Ronnie Motley, set out to locate Don Parker, for whom an armed robbery felony warrant was outstanding.

To begin their search, the officers traveled to suburban Maryland in plain clothes and in an unmarked car, a 1974 Pontiac station wagon. There they intended to interview Betty Parker. The officers did not bring the Parker warrant because they mistakenly assumed that their arrest authority in Maryland was curtailed and that Don and Betty Parker did not live together. When they arrived at the Parker address, they unsuccessfully attempted to contact their dispatcher by radio. Unfortunately, the officers were parked in a radio "dead spot," and they could not communicate with the ROP.

When the officers went to the door and identified themselves to Ms. Parker, she brought Mr. Parker to the door. Mr. Parker invited the officers into the house. The officers described the purpose of their visit and requested that Mr. Parker voluntarily accompany them to the D.C. police department. Mr. Parker denied any wrongdoing;

* Of the United States District Court for the Eastern District of Wisconsin, sitting by designation

pursuant to 28 U.S.C. § 294(d).

indeed, the armed robbery charge was eventually dropped. Mr. Parker also refused to leave with the two men who were not in possession of a warrant. Because his phone was disconnected, Mr. Parker asked the officers to radio either the local police or their ROP supervisors regarding the warrant, but the officers' dead radio barred that procedure. Finally, Mr. Parker ostensibly agreed to accompany the officers but asked for the opportunity to change his clothes. Officers Hayes and Motley granted this request; Mr. Parker went into his bedroom and escaped through the window into the neighboring woods.

Once the officers realized that they had been duped, they jumped into their station wagon and chased Mr. Parker around the surrounding neighborhood. To escape, Mr. Parker commandeered a late model Volvo, one that had just careened into the rear end of the officers wagon. Officer Hayes rushed out of his vehicle and tried to extricate Mr. Parker from the Volvo, but he was unable to accomplish this task. Operating under the erroneous assumption that Mr. Parker was threatening the driver of the car and that he was armed, Officer Hayes yelled: "Freeze Parker, don't do it." Transcript at 200. Mr. Parker continued to turn towards Officer Hayes, and the officer shot at him four times. Don Parker was hit twice, once in the abdomen and once in the spine, causing serious and permanent injury.

## II. ANALYSIS

### A. *Standard of Review*

In reviewing Judge Green's ruling on judgment n.o.v., we apply the standard applied when reviewing directed verdict rulings. *See Vander Zee v. Karabatsos,* 589 F.2d 723, 726 (D.C.Cir.1978), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979). A directed verdict or judgment n.o. v. is inappropriate unless there is only one reasonable conclusion to be drawn from the evidence and that conclusion is inconsistent with the verdict rendered. *Morgan v. District of Columbia,* 824 F.2d 1049, 1056 (D.C.Cir.1987). Our task on review is not to weigh or reconsider the evidence.

[W]e are required to evaluate the evidence under the presumption that the jury resolved all factual disputes in favor of the prevailing party. Moreover, we must give the advantage of every fair and reasonable inference to the prevailing party. Finally, we may not assess the credibility of the witnesses; that function is reserved exclusively for the jury. Our function is limited to certifying "only that fairminded jurors could reach the verdict rendered."

*Id.* (quoting *Grogan v. General Maintenance Service Co.,* 763 F.2d 444, 447 (D.C. Cir.1985)).

■ Despite strong factual underpinnings and clear precedent to the contrary, the District is, in effect, urging us to impose a less onerous standard for overturning jury awards in municipal liability cases under 42 U.S.C. § 1983. As the *Morgan* opinion illustrates with eloquent detail, jury awards are always "given the utmost of deference and respect." *Id.* at 1056. There is no authority to veer from this standard in cases involving awards against municipalities; we decline to adopt the District's implied suggestion to do so.

Our colleague's dissent is primarily based on his own interpretation of the facts, which is contrary to that of the jury. In our view, the dissent is seriously flawed by its failure to apply the "utmost ... deference" standard referred to above.

### B. *Substantive Law*

In *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality is liable under 42 U.S.C. § 1983 only when execution of its policy or custom causes a plaintiff to suffer constitutional injury. Since *Monell,* the Court has continued to explore the contours of municipal liability under § 1983. In a case involving a police shooting allegedly caused by inadequate training, the Court determined that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the

incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985).

The District contends that inadequate training cannot amount to a custom or policy giving rise to liability under 42 U.S.C. § 1983 as required by *Monell* and that even if it could, the Parkers' proof does not support a finding of such a custom or policy. We disagree. Unlike *Tuttle,* this case does not involve a single incident that gives rise to an inference of inadequate training. It involves a sad series of mishaps linked to a policy of sorely deficient training, supervision and discipline.

Although the Supreme Court has not yet resolved the question, the issue of whether liability can arise for injuries caused by a policy of inadequate training has come to the attention of the Court. *See City of Springfield v. Kibbe,* 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987); *Tuttle, supra,* 471 U.S. at 814 n. 2, 105 S.Ct. at 2431 n. 2. In *Kibbe,* for example, the Court originally granted certiorari to address the question of inadequate training and liability under *Monell,* but dismissed such certiorari as improvidently granted upon determining that the petitioner failed to preserve the "fairly included" question, *see* Supreme Court Rule 21.1(a), of whether more than negligence in training is required in order to establish such liability.

In *Tuttle,* the Court rejected a finding of § 1983 municipal liability for inadequate training based on a single incident of police misconduct. Whether the facts of a particular case could contain sufficient examples of misconduct to infer a policy of inadequate training was a question left unresolved by *Tuttle.* The Supreme Court has, however, recently accepted for review the sixth circuit case of *City of Canton v. Harris;* the issue of inadequate training for law enforcement officers and its relationship to municipal policy would appear intrinsic to that case. *See City of Canton v. Harris,* 798 F.2d 1414 (6th Cir.1986), *cert. granted,* —— U.S. ——, 108 S.Ct. 1105, 99 L.Ed.2d 267 (1988).

Until we receive contrary direction from the Court, we believe that § 1983 liability may be found under *Monell* when there is evidence of deliberate indifference manifest by systemic and grossly inadequate training, discipline, and supervision. We also believe that the standard articulated in the instruction proffered to the jury in this case reflects a proper standard. Limiting *Monell* to affirmative policies that violate constitutional protections is not necessary; the "policy or custom" language of *Monell* warrants no such conclusion. *See generally* Note, *Municipal Liability for Police Misconduct: Must Victims Now Prove Intent?,* 97 Yale L.J. 448 (1988).

As another panel of this court recognized in *Carter v. District of Columbia,* 795 F.2d 116, 122 (D.C.Cir.1986), "[p]olice misconduct cases such as this one ... do not involve express statements of policy.... To succeed, a plaintiff must show a course deliberately pursued by the city...." To establish the existence of a *Monell* pattern or policy, a plaintiff must present "concentrated, fully packed, precisely delineated scenarios." *Id.* at 125.

Thus, we uphold the district court's conclusion that liability may be imposed on a municipality upon a showing of deliberate indifference exhibited by a pattern of inadequate training, supervision and discipline of police officers provided there is a causal connection between such inadequacies and the risk of harm to others. *Accord, e.g., Spell v. McDaniel,* 824 F.2d 1380 (4th Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988); *Fiacco v. City of Rensselaer,* 783 F.2d 319, 326 (2d Cir. 1986) ("deliberate indifference"), *cert. denied,* —— U.S. ——, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987); *Voutour v. Vitale,* 761 F.2d 812, 820 (1st Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986); *Languirand v. Hayden,* 717 F.2d 220, 227 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984) (so grossly negligent as to constitute "deliberate indifference").

The incidents giving rise to the case at bar present the requisite "fully packed" scenario. Inadequately trained officers—in terms of both arrest procedure and physical aptitude—committed a series of mistakes resulting in serious injuries to an innocent man. There were no consequent sanctions or even reprimands. From these facts, a clear pattern of inadequate police training and discipline emerges.

## C. *Specific Challenges*

The District challenges the jury's determination on two grounds. First, the District contends that the evidence was not sufficient to establish inadequacies in training, discipline or supervision. Second, the District claims that even if some such deficiencies were established, they were not the "moving force" behind Mr. Parker's injuries because Mr. Parker's own actions were superseding causes. Both of the District's challenges go to factual issues which were before the jury, and we will not disturb its findings in this case.

■ We find that there is ample evidence in the record to support the jury's finding of deliberate indifference to adequate training, supervision and discipline. For instance, Roy C. McLaren, Chief of Police at Miramar, Florida and co-author of *Police Administration,* a widely used police textbook, testified as an expert regarding the ROP's training in extrajurisdictional arrest procedures. In Chief McLaren's opinion the ROP officers lacked sufficient knowledge in this area.

A: Although the outline for the training consists of one week of instruction, the amount of instruction given to the officers, from what I can gather from looking at the reports and depositions and the responses made by the officers, the actual instruction given to them for some of the activities that they had to confront was inadequate.

Q: And in what way was it inadequate, Chief McLaren?

A: It failed to cover the circumstances that they would confront in making an arrest or a detention in Maryland, in Prince Georges County or in the State of Maryland, or in any outside jurisdiction outside of the District, and it did not give instructions on how to remain in contact with headquarters and guidance on what to do in the event that that contact was lost, in the event that they could not maintain radio contact or telephone contact with their supervisors.

And it did not clarify the authority that the officers would have in making an arrest or a detention on an individual outside of the District of Columbia.

Transcript at 677–678.

Indeed, the officers' training regarding extrajurisdictional arrest authority consisted of a single memo by the head of the ROP, Edward Spurlock. Mr. Spurlock's memo failed to disclose that the ROP was authorized to arrest suspects in Maryland in circumstances like those leading up to the shooting underlying this case.

We have considered also the record evidence on Officer Hayes' general physical training and, specifically, his disarmament training and believe that it too illustrates deliberate indifference to adequate training. Charles W. Bates, a security consultant and former F.B.I. agent, testified as an expert regarding Officer Hayes' disarmament training. Agent Bates described, and eventually demonstrated on the Parkers' counsel, how Officer Hayes could have subdued Mr. Parker without use of deadly force. *See* Transcript 281–285. According to Agent Bates, Officer Hayes' failure physically to subdue Mr. Parker evidenced a serious deficiency in the officer's training program.

It is undisputed that Officer Hayes had no physical training for four years prior to the Parker incident. Indeed, he was off duty because of a fractured shoulder until just two months before the incident that gave rise to this lawsuit. Given Officer Hayes' physical condition, it is not hard to fathom that his most effective method for subduing the objects of his pursuits would be the use of a firearm as opposed to the application of physical force. Officer Hayes simply was not in adequate physical shape. This condition posed a foreseeable risk of harm to others. We are persuaded

that a fair-minded jury could have concluded that Officer Hayes' conduct was the result of deliberate indifference on the part of the District with respect to the physical training of its police officers.

As to the inadequacies of its discipline and supervision, a telling example is the District's failure to take any disciplinary action whatsoever with respect to Officer Hayes. Assistant Police Chief Theodore Carr, the administrative officer responsible for reviewing cases involving alleged misconduct, determined that Officer Hayes mishandled the Parker incident and should have been "recycled through the firearms training course so that any—so he can be refreshed in terms of policies and procedures." Transcript at 920. Despite this internal order, no such action was ever taken.

We turn now to the District's challenge to the jury's finding on causation. As the District correctly points out, a municipal policy must be the "moving force" behind the alleged constitutional violation before a plaintiff may recover under § 1983. *Tuttle, supra,* 471 U.S. at 820, 105 S.Ct. at 2434. In this circuit, a municipal policy is deemed to be the moving force of a constitutional injury if the

> conduct is a substantial factor in bringing about harm.... The defendant may be held liable for harm that is "foreseeably attributable" to his conduct as well as for unforeseeable harm attributable to his conduct, unless it appears that the chain of events is "highly extraordinary in retrospect."

*Morgan, supra,* 824 F.2d at 1062–63 (quoting *White v. United States,* 780 F.2d 97, 106 (D.C.Cir.1986)) (citation omitted).

■ We can easily conclude that the record supports the jury's determination that the District officers' deficient training was a substantial factor in bringing about Mr. Parker's injuries. The unreasonable use of deadly force was an immediate cause of such harm. Officer Hayes shot at Mr. Parker four times. He resorted to use of his gun because he was unable physically to subdue Mr. Parker by less drastic means; his physical condition was deficient because the District was deliberately indifferent to his physical training program.

Moreover, the record adequately supports the finding that the officers' misunderstanding of their extrajurisdictional authority caused the underlying confused atmosphere. Chief McLaren articulated the nature and dangers associated with such confusion. He testified that "[t]he confusion may introduce uncertainty in the mind of the person that they are confronting so that in fact, a person being confronted in the field by a police officer ... may act differently than the person would have had that element of confusion not been there." Transcript at 682. The record establishes a "substantial factor" relationship between the officers' uncertainties and Mr. Parker's reaction. Considered together with Officer Hayes' lack of physical conditioning and disarmament training, the circumstances giving rise to Mr. Parker's injuries persuade us that the moving force element of *Monell* is satisfied.

To bolster its moving force argument, the District attempts to analogize this case to *Cameron v. City of Pontiac,* 813 F.2d 782 (6th Cir.1987). In the latter case, the plaintiff filed a cause of action under 42 U.S.C. § 1983 alleging that a Pontiac police officer's unreasonable use of deadly force caused her husband's death; he was hit by a truck when he ran across a highway in an attempt to escape from a city police officer. The court of appeals for the sixth circuit upheld the trial court's determination that the plaintiff's death was "completely independent" of the application of deadly force by the defendant's employee-police officer.

The District contends that *Cameron* is similar to the case at bar. Accordingly, the District urges us to adopt the *Cameron* court's reasoning and reject the existence of a causal connection between Officer Hayes' conduct and Mr. Parker's injuries. We disagree. The chain of events leading to Mr. Cameron's death was "highly extraordinary in retrospect." *Morgan, supra,* 824 F.2d at 1063. "[Mr. Cameron] was killed when he, at his own election, ran onto a high speed freeway. The district court was correct in concluding that this

was unforeseeable, and that it would be an absurd result indeed to permit recovery for a felon's unwise choice of an escape route." *Cameron, supra,* 813 F.2d at 786.

Unlike Mr. Cameron, Mr. Parker was not injured when he was run over by a truck passing coincidentally along his escape route, he was seriously injured when the plainclothed police officer, who did not possess an arrest warrant, chased him and shot at him. The connection between Officer Hayes' actions and Donald Parker's injuries can readily be found to be direct and causal whereas the connection described in the *Cameron* case is far more attenuated and non-causal. We conclude that the jury's verdict on this issue is not unreasonable.

### D. *Jury Instructions*

The defendant also contends that reversal is warranted by the trial court's decision not to charge the jury regarding use of deadly force according to the language set forth in *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). In that case the Supreme Court held as follows:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not unconstitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 11–12, 105 S.Ct. at 1701.

Before the jury was instructed, the parties argued about the contents of the charge to be submitted to the jury. At that time, the District advocated the use of an instruction that included language quoted from *Tennessee v. Garner,* contending that the District's official policy is consistent with this language.

What the District's *official* policy consists of is not the issue here and is not properly the basis of a jury charge. That Officer Hayes may have believed that he was being threatened, and that he did, in fact, issue an oral warning to Mr. Parker to "freeze," does not dispose of this aspect of the appeal. The jury was charged with evaluating the adequacy of District police training, supervision and discipline with regard to the use of deadly weapons rather than investigating the official weapons policy of Officer Hayes and the District. The jury arrived at its verdict upon a consideration of the actual customs and policies of the ROP. For this reason, we deem Judge Green's instructions on the use of excessive force, although not comprehensive, to be sufficient to convey the law of this fact-bound case.

Furthermore, the District failed properly to preserve its objection on this matter. The District requested the giving of a *Garner* instruction and Judge Green denied this request. In so doing, Judge Green commented that the District's request, and its underlying interpretation of *Garner,* could constitute interesting issues for appeal. Judge Green's comments, however, did not preserve the issue for appeal. Rule 51, Federal Rules of Civil Procedure, sets forth the procedure for effectively preserving challenges to jury instructions: "No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, *stating distinctly the matter objected to and the grounds of the objection." Id.* (emphasis added). The District failed to adhere to Rule 51; it neglected to state distinctly its specific objections to Judge Green's charge before the jury retired to deliberate. Absent such specified objection, it would be overreaching for this court to reject the instructions and to upset the jury's verdict.

The current posture of this case distinguishes it from a recent decision in which the Supreme Court did not require strict compliance with the requirements of Rule 51. In *City of St. Louis v. Praprotnik,* — U.S. ——, 108 S.Ct. 915, 99 L.Ed.2d 107

(1988), the Court declined to dismiss a challenge to a jury verdict imposing municipal liability despite the petitioner's failure timely and properly to preserve its objection to a portion of the underlying jury instruction. The Court found that dismissal subsequent to its decision to grant certiorari would "undermine the policy of judicial efficiency that underlies Rule 51." *Id.* 108 S.Ct. at 922. By contrast, policies of judicial efficiency and finality of judgments require us, at this relatively early stage of the appellate review process, to adhere to the clear directives of Rule 51. In any event, we are convinced that the instructions presented to the jury did not contain any flaws which rise to the level necessary to constitute plain error.

Therefore, we affirm the judgment of the district court.

WILLIAMS, Circuit Judge, dissenting:

A seasoned District of Columbia police officer grappled with a bank robbery suspect who was attempting to hijack an innocent woman's car and—as she happened to be in it—kidnap the woman. The suspect slipped from the policeman's grasp and thrust his right hand toward his waistband. The officer drew his service revolver and ordered the suspect to halt. The suspect did not heed the warning; his right hand obscured from view, he turned toward the policeman. The police officer had only a millisecond in which to act. Believing that his life and the life of the innocent woman were in immediate peril, he fired four times in quick succession. The suspect, who had not been armed after all, fell to the ground a paraplegic.

With the benefit of hindsight it is now clear that the officer need not have shot the suspect. But the jury, informed of the officer's vantage point at the time of the shooting, found his actions not unreasonable; it rejected the plaintiff-suspect's assault and battery claim against the District. However, perhaps out of sympathy for the victim, the very same jury found the District liable under 42 U.S.C. § 1983 (1982). § 1983 provides for a damage action against

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws....

Parker's § 1983 theory argued that the District's inadequate training of its police force deprived him of his Fourth Amendment right not to be seized with unreasonable force. *See Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

The District moved for a judgment N.O.V., which the trial court denied. The majority affirms, with an opinion nominally accepting the view that municipalities may be liable under § 1983 for inadequate police training only if the acting officer's violation stemmed directly from municipal policymakers' "deliberate indifference" to such violations. The court's words are equivalent to those employed in other circuits. *See, e.g., Herrera v. Valentine,* 653 F.2d 1220, 1224 (8th Cir.1981) (liability may be found where city pursues police training so defective that "the municipality exhibits a deliberate indifference to the resulting violations of a citizen's constitutional rights" (internal quotations omitted)). Its application of the standard, however, drains the words of any constraining force. Accordingly, and fully recognizing that a lengthy dissent based on the probative value of specific evidence "is seldom worth writing or reading," *Carter v. Duncan–Huggins, Ltd.,* 727 F.2d 1225, 1239 (D.C.Cir.1984) (Scalia, J., dissenting), I must set out my quite different view of the evidence. The majority also dismisses the District's well-founded objection to the trial court's erroneous charge on the constitutional limits on the use of deadly force. I dissent on that issue as well.

## I. BACKGROUND

To support its outcome in this case, the majority paints a distorted portrait of the police officer whose actions are at issue, unnecessarily maligning him in the process. *See, e.g.,* Maj.Op. at 713–14. Although

many of the facts surrounding the shooting of Donald Parker are in dispute, Officer William Hayes's record and qualifications are not. A highly-decorated army helicopter pilot and Vietnam combat veteran, Hayes joined the Washington metropolitan police force in 1971. Testimony of Hayes, Tr. 1671–90. In his first six years on the force his duties ranged widely. He worked as an undercover agent infiltrating and investigating the Black Panther Party, and did stints in the homicide, civil disturbance and special operations divisions. *Id.* at 1690–1715. During his time in special operations he was essentially a member of a SWAT team, *id.* at 1708, and received intensive training in numerous law enforcement skills, including hostage negotiations, riot control, and disarming armed and dangerous suspects. *Id.* at 1703–10. His performance on the street was extraordinary. He participated in over 200 arrests, *id.* at 1711, earned more than a dozen commendations, *id.* at 1722, and on at least three occasions singlehandedly arrested armed felons, *id.* at 1722–25. With the exception of the incident central to this case, and of course in practice at the firing range, Hayes never found it necessary to discharge his service revolver. *Id.*

In 1982 Hayes applied for a position in the District's new repeat offenders project ("ROP"), a special police unit created to focus on suspects who were believed to be committing a disproportionate number of crimes in the District. In April, he was hand-picked from a field of about 500 applicants to be one of 88 ROP operatives. Testimony of Inspector Spurlock, Tr. 1532–35. Before hitting the streets, each ROP officer completed a specially designed, intensive one-week training program.

On the morning of November 15, 1982, Hayes and his partner, Ronnie Lee Motley, were instructed to find out the whereabouts of Donald Parker. Parker was believed to have participated with Charles "Dusty Face" Johnson in an armed robbery of a pharmacy, and there was a warrant out for his arrest. Before starting the search, Hayes checked Parker's file, and learned that Parker had several arrests and prior convictions for, among other offenses, armed robbery and carrying a pistol without a license. Testimony of Hayes, Tr. 1742. Parker was currently on parole for armed robbery of a bank. *Id.*

After pursuing what turned out to be a bum lead, Officers Hayes and Motley were instructed, by radio, to proceed to the home of a woman who was believed to be Parker's estranged common-law wife to see if she could help them locate Parker. When they arrived at Mrs. Parker's residence in Oxon Hill, a Maryland suburb of the District, the officers attempted to reach their dispatcher, but found that they could not; they were apparently in a "dead spot"—a place where a physical obstruction prevents the transmission of readable radio signals. Testimony of Motley, Tr. 368–71. The officers approached the door and knocked; Mrs. Parker appeared at a window. The officers identified themselves as District police officers. They then asked whether she would be willing to answer a few questions. Without replying, Mrs. Parker withdrew from view. Soon Donald Parker, whom Hayes recognized from his photograph, appeared at the window. The officers once again identified themselves and informed Parker that they were there to investigate a criminal matter involving him. Parker invited the officers in.

Once inside, the officers noticed the presence of two small children. Testimony of Hayes, Tr. 1773–74. Unsure of his extrajurisdictional arrest authority and sensitive to the potential for violence or a hostage situation within the home, Testimony of Hayes, Tr. 1773–74, Hayes told Parker of the outstanding warrant for his arrest and attempted to persuade him to voluntarily accompany them to the station. Parker denied participation in the crime,[1] and refused to accompany the officers unless they could produce a warrant. As the officers were on an investigative mission and had not expected to find and confront Par-

---

**1.** Hayes later testified that Parker, after being informed that his alleged co-suspect was Dusty Face Johnson, claimed to be on the outs with Dusty Face, having recently shot his alleged accomplice five or six times in a dispute over money. Testimony of Hayes, Tr. 1775.

ker, they didn't have the warrant with them. The officers then suggested alternatives: Parker could call an attorney to meet him at the station, *id.* at 1776, or allow the officers to phone the Prince George's County police to effect the arrest, *id.* at 1773. But neither option was possible; Parker said his phone was disconnected. *Id.* at 1776. The police, for their part, refused to leave without their quarry. Stalemate. Eventually Parker agreed to accompany the officers so long as they would first permit him to dress. The officers agreed and allowed him to go to his bedroom. A couple of minutes later, Hayes noticed the dining room curtain move. *Id.* at 1786. He looked out the window in time to see Parker leap to the ground from his bedroom window ledge. *Id.* Hayes and Motley ran for the door, and the chase was on.

Motley pursued Parker on foot through a nearby wooded area. Hayes returned to the car and drove it to the spot where Parker and Motley had entered the woods. Parker, having circled back, emerged from the woods and ran, hands waving, towards Hayes' car. Hayes stopped the car and began to open the door. Testimony of Hayes, Tr. 1794. Upon recognizing Hayes as the driver, Parker turned and ran in the opposite direction. *Id.* at 1795. As Hayes stepped out of his car to give chase, it was rear-ended by a Volvo (driven by Desrine Rainford), Testimony of Motley, Tr. 345; Testimony of Hayes, Tr. 1795, and knocked into a roadside ditch. Parker ran to the driver's side of the Volvo, opened the door, shoved Rainford aside, and leaped into the car, half onto Rainford's lap. Testimony of Rainford, Tr. 889–90, 893; Testimony of Hayes, Tr. 1796.

When Hayes approached the car, he saw Parker's foot near the accelerator and his right hand on the steering wheel. Fearing a hijack and hostage-taking, he ordered Parker to halt. Parker refused, saying "F__ you. I gonna...." Testimony of Hayes, Tr. 1797. Hayes grabbed Parker, lifting him from the automobile. *Id.* at 1800. But Parker somehow managed to yank himself from Hayes' grasp and put his right foot back in the car. *Id.* at 1801.

When Hayes tried again to extract Parker from the car, he saw Parker's right hand move towards his waistband. *Id.* at 1805. (Parker may have so gestured because Ms. Rainford had just poured her cup of tea on his crotch. Testimony of Rainford, Tr. 894). Believing that Parker was reaching for a gun, Hayes stepped back and drew his service revolver, yelling "Freeze, Parker, don't do it." *Id.* at 1803. His right hand still obscured by his body, Parker began to turn toward Hayes. *Id.* at 1804. Hayes was familiar with Parker's history of weapons offenses and had reason to believe that Parker had shot Dusty Face five or six times over money. *Id.* at 1805. In the split second in which he had to make a decision, Hayes thought that Parker was armed and that Parker posed an immediate threat to his life and Ms. Rainford's. *Id.* at 1806. Hayes discharged his revolver four times in quick succession, hitting Parker twice. Parker, who, as it turned out, had not been armed, slumped across the automobile door, staggered a few steps and fell.

One of Hayes' bullets lodged in Parker's spine. As a result of the shooting Parker is now a paraplegic. It is clear, in retrospect, that neither Rainford's nor Hayes' life was in imminent peril. Parker was needlessly crippled. The question before this court, however, is not whether Hayes actually needed to shoot Parker. Rather, the issues are first, whether the jury was properly instructed, and second, whether even a properly instructed jury could reasonably find that the District pursued a police training program so defective as to manifest "deliberate indifference" to the risk of constitutional violations by its police force, and that such defects caused Parker's injury.

This dissent will first analyze the error in jury instructions. It will then review the origins of the "deliberate indifference" standard and the reasons for drawing a rigorous distinction between it and mere negligence. Finally, it will review the evidence in light of that standard.

## II. ERRORS IN THE JURY INSTRUCTION

To find the District liable under § 1983, the jury had first to find that Hayes violated Parker's Fourth Amendment right to be free of unreasonable seizures. *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Parker introduced expert testimony that it is unreasonable for an officer to shoot until he has actually seen a weapon. Although this testimony was properly before the jury in reference to Parker's common-law claims, McLaren's concept of acceptable police conduct conflicts with and is more stringent than the governing Fourth Amendment standard. In *Garner*, the Court held that it is not unreasonable for a police officer to use deadly force when he "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." 471 U.S. at 11, 105 S.Ct. at 1701. Regardless of its relative merits as a matter of police policy, McLaren's standard is clearly more demanding than the Supreme Court's test; it makes actual sight of the weapon essential and thus precludes any reliance on circumstantial evidence. Thus the jury could not properly consider McLaren's standard in its decision as to whether Hayes violated Parker's Fourth Amendment rights.

To prevent the jury from adopting McLaren's standard as its constitutional benchmark, the District requested the district court to instruct the jury in terms of *Garner's* definition of constitutionally permissible use of deadly force. Before the court charged the jury, the District's counsel reviewed Judge Green's proposed instructions and requested that she add "at least the second paragraph of [its] proposed instruction No. 4." Tr. 2196. This paragraph reads, in part, as follows: "Under the fourth amendment, it is constitutional for a police officer to use deadly force in apprehending a suspect, if he has probable cause, that is a reasonable belief that the suspect poses a threat of serious physical harm, either to the officer or to others." Judge Green noted the District's objection to the existing instructions, but refused to so alter them. Tr. 2196–97. In view of the drastic gap between the law

under *Garner* and McLaren's testimony, as well as the confusion manifested by the jury's inconsistent verdicts (see p. 728 & n. 3 below), the error was far from harmless.

The majority dismisses the error with the claim that the District "failed to adhere to Rule 51 ... [when] it neglected to state distinctly its specific objections to Judge Green's charge before the jury retired to deliberate." Maj.Op. at 715. But in fact Judge Green explicitly stated, just before the jury retired, that the parties should state only *new* objections to the instructions as given, as she considered the objections made in the previous day's colloquy already preserved for the record. Tr. 2230–31. I cannot grasp why the court now faults the District for having refrained from a repetition that would have defied the judge's instructions and likely have been contemptuous. To do so is not to preserve orderly trial procedures but to invite their disruption.

As the jury may well have found the predicate constitutional violation using an invalid standard, its § 1983 verdict should not stand.

The instructions included a second critical error, this one on the standard applicable to the District itself:

> The burden is on the plaintiff, Don Parker, to establish by a preponderance of the evidence that the District of Columbia failed adequately to train, supervise and discipline Officers Hayes and Motley and that this failure constitutes gross reckless and gross indifference to the civil rights of Mr. Parker *in that such inadequate training, supervision and discipline would involve a risk of harm to others.*

Tr. 2222 (emphasis added). The italicized portion of this instruction implies that a finding of gross recklessness or gross indifference is called for once the jury determines that the training was "inadequate" in any way that would "involve a risk to others." Not even an "unreasonable risk!" This suggested a standard even lower than one of common-law negligence, essentially

one of strict liability. Such low-level "inadequacies" plainly do not reflect the "deliberate indifference" to constitutional violations that all members of the panel agree is the correct standard (explained in detail in part III).

Had the District properly objected to this conception of § 1983 liability and then raised the matter before us, it would require reversal. Had it merely raised the matter for the first time on appeal, I would find plain error. Cf. *Anderson v. Group Hospitalization, Inc.*, 820 F.2d 465, 469 n. 1 (D.C.Cir.1987) (acknowledging uncertainty as to whether this circuit recognizes the "plain error" doctrine in civil cases). In fact it did neither. Although *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir.1983), wisely counsels that we should normally not address unbriefed issues, it does so on the premise that we would otherwise be deprived "of that assistance of counsel which the system assumes." *Id.* As we need no such assistance on the point, I think it an independent ground of reversal.

In any event, the *Garner* error calls for reversal of the judgment and remand for a new trial.

## III. The "Deliberate Indifference" Standard

As the majority and I agree that a municipality should be liable under § 1983 for unconstitutional acts resulting from inadequate police training only if its training policies reflect "deliberate indifference" to those violations, it may seem pointless to argue the legal standard. But it is facts that give words their meaning. In China after Mao, it is said that many parroted the slogan attributing the country's ills to the "Gang of Four," but simultaneously held up a hand with five fingers outstretched— an extra one for the Great Helmsman himself. Here the majority talks deliberate indifference, but I can fathom their belief that the facts satisfy that standard only as a product of their reluctance to acknowledge the policies restricting municipal liability under § 1983. I write to underscore the force of those policies and the reasoning behind the requirement of deliberate indifference.

In *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that cities and other local governing bodies are "persons" subject to liability under § 1983, overruling its decision to the contrary in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). But it explicitly rejected the idea of *vicarious* municipal liability. *Id.* at 690–95, 98 S.Ct. at 2035–38. Rather, the Court accepted liability only where "execution of a government's policy or custom ... inflicts the injury," *id.* at 694, 98 S.Ct. at 2037–38, or (in a formulation seemingly intended as identical) where "official policy" has been "the moving force of the constitutional violation," *id.; see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n. 8, 105 S.Ct. 2427, 2436 n. 8, 85 L.Ed.2d 791 (1985) (reiterating the "moving force" metaphor and condemning "loose language in the charge leaving it to the jury to determine whether the alleged inadequate training would likely lead to 'police misconduct' "); *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981).

For reasons that will soon be apparent, § 1983 liability for egregiously defective police training is compatible with *Monell's* requirement of a municipal policy; the other circuits facing the issue since *Monell* have so found. The majority's statement of the law appears to coincide with their views. Under this consensus, a municipality's inadequate training of police can give rise to liability under § 1983 if (1) the training is so grossly negligent or reckless as to reflect deliberate indifference to the constitutional violations that will inevitably result, and (2) the inadequate training is the moving force behind a violation of a plaintiff's constitutional rights. *See* cases cited at Maj.Op. at 712; *see also Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir.) ("so reckless or grossly negligent that future police misconduct is almost inevitable ..., or would properly be characterized as substantially certain to result") (citations omitted), *cert. denied*, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982); *Herrera v.*

*Valentine,* 653 F.2d 1220, 1224 (8th Cir. 1981) (deliberate indifference or tacit authorization); *McLaughlin v. City of La-Grange,* 662 F.2d 1385, 1388 (11th Cir.1981) (simple negligence not sufficient), *cert. denied,* 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed. 2d 856 (1982).

Liability for deliberate indifference serves as a backstop to liability for *explicit* municipal authorization of § 1983 violations. Without it, municipal policymakers could wink at rampant police misconduct but keep the municipal treasury safe. Of course where plaintiffs could prove the wink, the resulting violations would be chargeable to the city as explicit policy. But proof of a wink may fail for no fault of the plaintiff, and on a strong enough record the fact-finder should be able to infer tacit complicity.

Grounding liability for deliberate indifference in a backstop function finds support in *Monell's* discussion of the inclusion in § 1983 of "customs" and "usages" among the state prescriptions under "color" of which the forbidden deprivation may occur. The Court quoted Justice Harlan's point in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970), that custom and usage were included "because of the persistent and widespread discriminatory practices of state officials.... Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *See Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. Just as including state involvement through discriminatory practice prevents evasion through, as it were, government body language, so liability for deliberate indifference prevents evasion through a calculated municipal failure to cure training defects with a high and obvious probability of generating excessive constitutional violations.

The backstop role surely requires no more expansive a standard than that of deliberate indifference. The question remains whether a reasonable construction of § 1983 and *Monell* suggests more. Of course Congress's main target in adopting the predecessor of § 1983 was the Klansmen's brutalization of the freedmen. Although Congress obviously provided a remedy against broader evils, *cf. Monell,* 436 U.S. at 683, 98 S.Ct. at 2032, it would be startling to find it evolve into a basis for federalizing (and judicializing) the complex political issue of how to reduce the imperfections of municipal government.

The Court's language in *Monell* appears to refer only to policy decisions that can be linked by *intention* to the resulting constitutional violations. The Court held, per Justice Brennan, that "[l]ocal governing bodies ... can be sued directly under § 1983 ... where ... the action that is alleged to be unconstitutional *implements* or *executes* " a governmental policy. 436 U.S. at 690, 98 S.Ct. at 2035–36 (emphasis added). The words "implement" and "execute" surely connote a direct and intentional link between the policy and the unconstitutional outcome. Police officers' constitutional infringements do not "implement" or "execute" a sloppy training policy. *Cf. Pembaur v. City of Cincinnati,* 475 U.S. 469, 482 n. 11, 106 S.Ct. 1292, 1299 n. 11, 89 L.Ed.2d 452 (1986) (noting that both the plurality and concurrence in *Tuttle* "found plaintiff's submission inadequate because she failed to establish that the unconstitutional act was taken *pursuant to* a municipal policy" (emphasis in original)).

Certainly the subsequent opinions of the justices provide little support for any more expansive liability. The Court came closest to addressing the issue explicitly in *City of Springfield v. Kibbe,* 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987), but a five-justice majority (Justices Brennan, Marshall, Blackmun, Stevens and Scalia) dismissed the writ as improvidently granted; the defendant city's petition for certiorari had not objected to the jury instruction permitting liability on the basis of *gross* negligence. Those who dissented evidently regarded that instruction as too lax. Writing for herself and Chief Justice Rehnquist and Justices White and Powell, Justice O'Connor took the position that " 'inadequacy' of police training may serve as the basis for § 1983 liability *only* where the

failure to train amounts to a reckless disregard for or deliberate indifference to the rights of persons within the city's domain." 107 S.Ct. at 1121 (O'Connor, J., dissenting).

The *Kibbe* dissenters identified an inherent hazard in imposing § 1983 liability for municipal policies that do not *compel* a constitutional violation. Because of the confusion arising from intervening causes, even a nominally stringent causation requirement could not prevent damage judgments based on illegitimate jury conjecture:

[A]t the time of the officers' alleged misconduct, any number of other factors [may have also been] in operation that were equally likely to contribute or play a predominant part in bringing about the constitutional injury: the disposition of the individual officers, the extent of their experience with similar incidents, ... and so forth. To conclude, in a particular instance, that omissions in a municipal training program constituted the 'moving force' in bringing about the officer's unconstitutional conduct, notwithstanding the large number of intervening causes also at work up to the time of the constitutional harm, appears to be largely a matter of speculation and conjecture.

480 U.S. 257, 107 S.Ct. 1114, 1120–21, 94 L.Ed.2d 293 (1987).

But the expressions of the justices composing the *Kibbe* majority hardly suggest a readiness to find liability much more readily. As we have noted already, Justice Brennan's opinion for the Court in *Monell* itself found liability where an unconstitutional act "implements or executes" municipal policy, language strongly suggesting deliberate intent. He also noted that some congressional supporters of § 1983 had made clear that they intended the Act to reach situations where "officers of the State were *deliberately indifferent* to the rights of black citizens." 436 U.S. at 685–86 n. 45, 98 S.Ct. at 2033 n. 45 (emphasis added). In *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), where the majority

overturned a judgment against a municipality because the charge allowed the jury to infer " 'gross negligence' or 'deliberate indifference' " from a non-policymaker's single excessive use of force, *id.* at 821, 105 S.Ct. at 2435, he concurred, and, writing for himself and Justices Marshall and Blackmun,[2] observed that the plaintiff "bore the burden ... of proving" that his injuries resulted from " 'conscious choices' ... made by the city concerning police training and supervision," *id.* at 829–30 n. 4, 105 S.Ct. at 2439 n. 4 (internal citation omitted). In *Tuttle*, moreover, Justice Brennan explicitly rejected mere "but for" causality, invoking at least the limiting principles of tort law. *Tuttle*, 471 U.S. at 833 n. 8, 105 S.Ct. at 2441 n. 8. Finally, in Part II–B of his opinion in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), concurred in by Justices White, Marshall and Blackmun, he wrote that

municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Id.* at 483–84, 106 S.Ct. at 1300. *See also* George D. Brown, Municipal Liability Under Section 1983 and the Ambiguities of Burger Court Federalism: A Comment on *City of Oklahoma City v. Tuttle* and *Pembaur v. City of Cincinnati*—the "Official Policy" Cases, 27 B.C.L.Rev. 883, 901 (1986).

In all candor, Justice Brennan's requirement of "conscious choice" is susceptible of a very expansive reading. He refers to specific municipal choices on police training, including not only issues going to the *content* of police courses ("when to shoot to kill"), but also such neutral issues as "how much time and emphasis [should] be placed on training in such matters as how to approach felony-in-progress situations." *Tuttle*, 471 U.S. at 829–30 n. 4, 105 S.Ct. at

---

**2.** Justice Stevens has consistently rejected *Monell*'s refusal to allow liability under *respondeat superior*. *See, e.g., City of Oklahoma City v.*

*Tuttle,* 471 U.S. at 834–44, 105 S.Ct. at 2441–47 (Stevens, J., dissenting).

2439 n. 4 (Brennan, J., concurring). But this list appears simply to have been identified by plaintiff. *Id.* at 829 & n. 4, 105 S.Ct. at 2439 & n. 4. Justice Brennan cannot be described as committed to the view that neutral municipal police training decisions, short of unleashing officers manifestly incapable of observing constitutional norms, would trigger liability.

Court decisions in closely related areas also warn strongly against imposition of § 1983 liability for misjudgments that at most increase the risk of constitutional violations. In *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the district court had issued an injunction against municipal officers merely upon a showing of an "unacceptably high" number of unconstitutional acts by their subordinates, *id.* at 373, 96 S.Ct. at 605, arguably caused by a departmental "tendency to discourage the filing of civilian complaints and to minimize the consequences of police misconduct," *id.* at 368–69, 96 S.Ct. at 603. The Court refused to countenance this judicial intervention. It contrasted these facts with those of the decision principally relied on by the district court, *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), in which "liability and injunctive relief were grounded [on] the adoption and enforcement of deliberate policies by the defendants there ... of excluding and removing the plaintiff's labor organizers and forbidding peaceful communication of their views to the citizens of Jersey City." *Id.* at 374, 96 S.Ct. at 605. In *Rizzo*, by contrast, there was no showing that the "behavior of the Philadelphia police was different in kind or degree from that which exists elsewhere." *Id.* at 375, 96 S.Ct. at 606. The Court found that "[n]othing in *Hague* ..., or any other case from this Court, supports such an open-ended construction of § 1983." *Id.* at 373–74, 96 S.Ct. at 605. Although *Rizzo* rested in part on a concern for the ill effects of injunctive intervention in the management of municipal police, it is hard to see that intervention through the imposition of large damage judgments would be materially less intrusive.

In the definition of Due Process, too, the Court has recently rejected the use of federal constitutional norms to supplant state policy on governmental negligence. In *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), it held that prison custodians' "lack of due care," far from being an "abuse of power" cognizable under the Due Process Clause of the Fourteenth Amendment, "suggests no more than a failure to measure up to the conduct of a reasonable person." *Id.* at 332, 106 S.Ct. at 665. *See also Davidson v. Cannon*, 474 U.S. 344, 347–48, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986) (refusing to find Due Process Clause liability under similar facts, even though state law immunities barred plaintiff from any state remedy; "lack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent"). The context is of course distinguishable; the Court addressed individual liability for violations of the Constitution's most open-ended provision and expressly left open the possibility that mere negligence might in some cases subject individuals to § 1983 liability under other provisions. *Daniels v. Williams*, 474 U.S. at 334, 106 S.Ct. at 666. Indeed, for a claim such as Parker's, that the use of unreasonable force made an arrest illegal under the Fourth Amendment, *individual* liability turns on "an objective standard of reasonableness ... determined by balancing the infringement of the individual's interest caused by the police action against the governmental interest served." *Martin v. Malhoyt*, 830 F.2d 237, 261 (D.C.Cir.1987) (§ 1983 action in which court applies standard set forth in *Tennessee v. Garner*, 471 U.S. 1, 7–8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985)). But nothing in *Monell* suggests any reason to suppose the Court intended the sort of close federal judicial control of municipal policy implicit in a rule of liability for a city's negligence in failing to prevent its officers' unconstitutional acts (whatever state-of-mind may be required for *their* liability).

As the majority notes, a Supreme Court analysis of municipal liability for inadequate police training under § 1983 appears imminent. *See City of Canton v. Harris,*

798 F.2d 1414 (6th Cir.1986), *cert. granted,* — U.S. ——, 108 S.Ct. 1105, 99 L.Ed.2d 267 (1988). The majority and I agree on "deliberate indifference" as the operative words of the likely formula. But one's perception of the force of a definition may depend on his sense both of the difficulty of defining a causal link and of the need for a sharp line between municipal negligence and actions so "abusive" as to invoke the majesty of federal constitutional intervention. Under *Monell* itself, illuminated by such decisions as *Rizzo* and *Daniels,* I think liability can be found only on a showing that municipal policymakers would have thought to themselves: "Yes, we recognize that our police training decisions are bound to generate an exceptionally high number of constitutional violations, but that's just tough." Parker made no such showing here. If the courts are not to federalize much of municipal government policy the courts of appeal must seriously police the border between garden-variety snafus and truly deliberate indifference to low-echelon constitutional violations.

### IV. APPLICATION OF THE STANDARD TO THE EVIDENCE

In reviewing the District's claims on appeal, we must of course accord the jury great deference, and uphold its verdict unless

> 'there can be but one reasonable conclusion,' drawn from the evidence viewed 'in the light most favorable to the plaintiff[ ] ..., giving [him] the advantage of every fair and reasonable inference that the evidence may justify.'

*Metrocare v. WMATA,* 679 F.2d 922, 924–25 (D.C.Cir.1982), *quoting Foster v. Maryland State Savings and Loan Ass'n,* 590 F.2d 928, 930 (D.C.Cir.1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 842, 59 L.Ed.2d 37 (1979). Our review proceeds, however, without deference to the trial court's denial of the motion for judgment N.O.V. *McNeal v. Hi–Lo Powered Scaffolding, Inc.,* 836 F.2d 637, 641 (D.C.Cir.1988). Upholding the verdict below requires the court to decide that a reasonable jury could have concluded that the District's training

policies manifested deliberate indifference to any enhanced likelihood of causing constitutional violations and that the alleged deficiencies were the moving force behind the alleged violation. Because of errors in the district court's instructions it is not at all evident that this jury did so find. See part II above. I believe that even with proper instructions, a reasonable jury could not so find. I would reverse.

One further preliminary comment: Many circuits refuse to uphold a finding of deliberate indifference unless the plaintiff can demonstrate a pattern of violations, predating the instant violation, that should have put the municipality on notice that its training policies were dangerously inadequate. *See, e.g., Spell v. McDaniel,* 824 F.2d 1380, 1387 (4th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988); *Languirand v. Hayden,* 717 F.2d 220, 227–28 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984); *Herrera v. Valentine,* 653 F.2d 1220, 1224 (8th Cir.1981); *McLaughlin v. City of LaGrange,* 662 F.2d 1385, 1388 (11th Cir.1981), *cert. denied,* 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed.2d 856 (1982); *cf. Rizzo v. Goode,* 423 U.S. 362, 373–77, 96 S.Ct. 598, 605–07 (in overturning injunction against city officials based on alleged violations by their subordinates, Court relies on absence of any pattern of violations). *But see Grandstaff v. City of Borger,* 767 F.2d 161, 170–71 (5th Cir.1985) (proof of multiple incidents of misconduct on night of the incident may indicate that the policemen knew at the time that their actions would "meet with the approval of city policymakers"), *cert. denied,* — U.S. ——, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987); *Kibbe v. City of Springfield,* 777 F.2d 801, 807–08 (1st Cir.1985) (similar), *cert. granted,* 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986), *cert. dismissed,* 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987). I will assume, *arguendo,* the laxer view—that on some imaginable facts one might find deliberate indifference without a pattern of prior similar conduct.

In order to prevail, Parker had to establish a defect in the District's training program, the requisite state of mind in munici-

pal policymakers with respect to that defect, and a strong causal link between that defect and his constitutional injury. Each alleged training inadequacy must stand on its own. We cannot find the requisite links by combining distinct liability theories in a vague § 1983 goulash. To do so would render the concept of deliberate indifference meaningless and trivialize the causation requirement.

Parker argued five theories to support his § 1983 claim. I address them *seriatim.*

1. *Extrajurisdictional training.* Parker attempted to show that the District inadequately trained its officers as to proper extrajurisdictional arrest procedures and as to their extrajurisdictional arrest authority. A critical aspect of their alleged inadequacy, as the majority opinion's summary makes clear, *see* Maj.Op. at 713, was that it *understated* the officers' extraterritorial authority. Had the officers been properly trained as to their authority to make extraterritorial arrests, Parker argues, they would have simply and promptly arrested him. Appellee's Brief at 35–36. (District police officers with probable cause to believe someone has created a felony may make a citizen's arrest in Maryland. *See Stevenson v. State,* 287 Md. 504, 413 A.2d 1340, 1346 (1980).) Had they done so, he would not have been made nervous by the drawn-out stalemate, would not have attempted to flee, would not have attempted to hijack a stranger's car, and thus would not have been shot.

Of course it is quite true that the officers' ignorance of their full authority played a role in creating the awkward standoff. But it seems unprecedented to suggest that the issuance of instructions understating officers' authority could manifest deliberate indifference to the constitutional violations that might very indirectly result. On this remarkable theory it is as risky for a municipality to pursue a Milquetoast's strategy as a Rambo's. Parker of course introduced no evidence of a pattern of similar incidents or of any other circumstances that would have alerted District policymakers to the risk that such a knowledge gap carried a special risk of causing

constitutional violations. I cannot perceive a basis for inferring the requisite deliberate indifference.

Further, Parker utterly failed to show the necessary causal link. At best, he has demonstrated "but for" causation. This is plainly not enough. *See Tuttle,* 471 U.S. at 833 n. 9, 105 S.Ct. at 2441 n. 9 (Brennan, J., concurring). Parker's theory minimizes the significance of intervening events and ignores the autonomy of the various players. It depends on the following causal chain: The District's inadequate training program left the officers confused as to their extrajurisdictional arrest authority, which created a tense atmosphere in the Parker home, which made Parker nervous and led him to attempt escape through his bedroom window, which resulted in a chase through the neighboring woods, which led to a confrontation between Parker and Hayes on the street which prompted Parker to attempt to hijack Desrine Rainford's car, which led Rainford to dump her tea on his lap, which caused Parker to reach his hand towards his pants while he was struggling with Hayes, which gave Hayes the impression that Parker was reaching for a gun, which caused Hayes to shoot him. This out-*Palsgrafs Palsgraf.* On such a theory, the want of a nail was "the moving force" behind the kingdom's loss.

*Cameron v. City of Pontiac,* 813 F.2d 782 (6th Cir.1987), properly rejected a similarly tenuous causal link. There policemen chased and shot at a fleeing suspect who, in an effort to escape, jumped a fence and sprinted onto a highway, where he was struck and killed by a passing truck. The court found that the policemen's use of deadly force "was not, as a matter of law, the proximate cause of [Cameron's] death." *Id.* at 786. Here, the District's training decisions were far less proximately connected to the ultimate shooting. (The majority seeks to distinguish *Cameron* on the ground that here Hayes' shooting was clearly the proximate cause of Parker's injury.) Maj.Op. at 715. But that is not in question. Parker's problem was to show that flaws in the *District's extrajurisdictional training policies* were the moving force behind the shooting.

2. *Adequate warning.* Parker attempted to demonstrate that Hayes' warning to him—"Freeze, Parker, don't do it"—was dangerously imprecise. Even assuming it was negligent of Hayes not to use an affirmative command, like "Put your hands over your head," Parker introduced no evidence as to the District's policy on how officers should warn potentially armed suspects. The jury was not free to infer a municipal policy from a single episode. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Nor do I believe one can find deliberate indifference to constitutional rights in the District's going the "wrong" way—if it is wrong—on such a subtle point of police procedure.

3. *Fitness training.* Parker argued at trial that the District was grossly reckless in not establishing minimum physical fitness standards for officers in its ROP unit. He claimed that had the District paid heed to fitness it would not have selected Hayes to be on the squad, and that if Hayes had been in reasonable shape he would have been able to handle the arrest without using his revolver.

Whatever the District's actual policies on the fitness of ROP officers, Hayes appears to have been in fine shape. To be sure, Parker did present some testimony as to Hayes' fitness during various time periods considerably prior to November 1982. He established (1) that in 1977 Hayes was unable to continue his SWAT team duties because he had developed a heart condition, pericarditis, (2) that Hayes had received a few citations for being overweight sometime between 1977 and 1982, and (3) that Hayes had suffered a hairline fracture of his right shoulder in July 1982.

While these may be interesting historical facts, none suggests any defect in Hayes' physical condition *at the time of the shooting.* By 1979 Hayes had recovered from his pericarditis well enough to resume extracurricular physical activities. He jogged a couple of miles each day, worked-out in his free time, and participated in martial arts courses and casual athletics. Testimony of Hayes, Tr. at 239. When he applied to join the ROP in 1982, he felt entirely fit for active duty. *Id.* at 1730, 1733.

Hayes did indeed suffer a hairline fracture in July 1982 when another vehicle struck his patrol car. *Id.* at 1734–35. On account of that injury his superiors temporarily relieved him of active duty. *Id.* at 257. By September, however, two months before the present episode, he had recovered fully and was certified as fit by the Board of Surgeons at the Police and Fire Clinic. Testimony of Inspector Spurlock, Tr. 1559; Testimony of Hayes, Tr. 1736. He resumed his duties on the ROP. There, because of his size and strength, he was often designated the "ram person;" *i.e.,* the officer who, when necessary, knocks down barricaded doors to facilitate police entry. Testimony of Inspector Spurlock, Tr. 1559. There is simply no basis for the canard that Hayes was "not in adequate physical shape." *Cf.* Maj.Op. at 713.

Further, the record contains no support for any finding that the District was deliberately indifferent to the danger posed by its failure to set minimum fitness standards. The only evidence bearing on the District's frame of mind was the testimony of Assistant U.S. Attorney Bowman, one of the founders of the ROP, who admitted that physical fitness probably ought to have been taken into account in officer selection. He attributed the oversight to the planners' assumption that most of the officers' surveillance would be by car. Tr. at 1334. This falls far short of deliberate indifference.

Finally, Parker presented no evidence whatsoever to support the thesis that any possible gap between Hayes' physique and Charles Atlas's was the moving force behind Hayes's failure to subdue him by hand. Acceptance of liability on this theory invites reliance on precisely the sort of rampant speculation and conjecture against which Justice O'Connor warned. *See* p. 722 above.

4. *Disarmament training.* Parker asserts that if Hayes had received adequate disarmament training he would have been able to subdue Parker physically, and

would not have shot him. Parker organizes his support for this theory carefully, but the resulting structure is rickety indeed. He points to (1) expert testimony that Hayes should have been able to use conventional law-enforcement techniques to remove Parker from the car and render him harmless. Testimony of Bates, Tr. 282; (2) Hayes's deposition statement that his formal training in "hand-to-hand" combat—consisting of two 30–minute sessions in 1972—had been "next to nothing," Tr. 233; and (3) an expert's opinion that if the District had provided its police officers with only one hour of physical disarmament training, that would have been inadequate. Testimony of McLaren, Tr. 693. All this is not remotely up to the task.

At no time did Parker's experts in fact review or analyse the District's training policy, much less assess it as inadequate. The main expert, Roy McLaren, testified only that *if* Hayes had received *only* two 30–minute sessions in disarming tactics, that would have been inadequate. Tr. 693.

The hypothesis was palpably false. It was founded solely on Hayes' reference to 60 minutes of police training in "hand-to-hand combat." But these 60 minutes were incontestably a small part of Hayes's overall training—the part consisting of *formal* training in how to attempt to physically subdue an attacker who has drawn a knife or gun. Testimony of Hayes, Tr. 234–35. The District presented undisputed evidence of continuous training: reviews at roll call of specific episodes and on-the-job disarmament training. Testimony of Hayes, Tr. 235–36; Testimony of Inspector Spurlock, Tr. 1516, 1529–30; *see also* Testimony of Murphy, Tr. 1942–43 (training provided by the District exceeds that furnished by most other jurisdictions).

In fact the District did not encourage policemen to use bare hands to physically disarm gun- or knife-wielding assailants. In view of the high risks of such activity, it treated martial arts training as supplemental, as providing a resource to be tried only as a last resort if for some reason an officer could not use the threat implicit in

his service revolver. Testimony of Hayes. Tr. 234–35. (Had the District emphasized such training, Parker would likely be arguing that it led to the fatal shooting: as a result of such emphasis, Hayes used grappling techniques instead of immediately drawing his revolver and telling Parker to put his hands up.)

Parker's experts evaluated only an incomplete portion of the District's training policy; they never came to grips with the policy issue of how much to stress hand-to-hand combat; and they provided no basis at all for a judgment that the District's downplaying of such techniques could be reasonably attributed to deliberate indifference to constitutional violations.

5. *Use of Deadly Force.* The District's policy was to instruct its officers to use deadly force only as a last resort: to save their lives or the lives of innocent persons, or to prevent the escape of a violent felon. Testimony of Inspector Spurlock, Tr. 1513–14; Testimony of Hayes, Tr. 1696–97. Hayes, believing that both his life and Desrine Rainford's were in danger, *id.* at 1806, fired before seeing an actual weapon.

Parker contends that if Hayes had been properly instructed he would have held his fire until he had actually seen a weapon, and his experts so testified. But it is the Supreme Court, not Parker's expert testimony, that defines when a police officer may constitutionally shoot. The Court in *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985), held that "[w]here [an] officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." It explicitly approved of police department policies that "allowed the firing of a weapon only when a felon presented a threat of death or serious bodily harm." *Id.* at 18–19, 105 S.Ct. at 1705. As the District's policy complies with, and is practically identical to, this standard, the jury was not free to decide that the experts' suggested policy was more to its taste.

Apparently conceding that Parker's attack on the district's "official policy" may be blocked by *Garner*, the majority hints that the jury could have found that the District's *actual* policy was less restrictive than the apparent official one. Maj.Op. at 715. But the facts do not support the hint. The District presented evidence to substantiate its claim that its officers were indoctrinated in its official policy. Testimony of Inspector Spurlock, Tr. 1508–13. Hayes testified that he knew and understood that policy. Tr. 1696–97. Parker introduced no evidence supporting the existence of an alternative "actual" policy.

Of course, the jury could have found that when Hayes fired he could not have reasonably believed that he or Ms. Rainford was in danger. Perhaps it leapt from this to a belief that the District trained its policemen to shoot prematurely. But *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821, 105 S.Ct. 2427, 2435, 85 L.Ed.2d 791 (1985), plainly forbids the fact-finder to infer a municipal policy from a single action of a non-policy-making employee.

There is a second possibility. Theodore Carr, Assistant Police Chief of the District of Columbia, conducted an official review of Hayes's conduct in the shooting. He determined that Hayes's decision to fire was not justified by the actual danger posed, and he recommended that Hayes be fined and recycled through the firearms training course. Tr. 917–20; Plaintiff's Exhibit 40, 2 Joint Appendix (J.A.) E–4—E–8. Although Chief of Police Turner initially agreed with this assessment of the facts, he later set aside the fine, Tr. 923–24, and Hayes was never put through a firearms retraining program as a consequence of the shooting. *Id.* at 1618. The majority treats the nullification of the fine and failure to retrain as "a telling example" of the inade-quacies of the District's discipline and supervision, Maj.Op. at 714, possibly viewing it as evidencing a *de facto* policy in conflict with the official one.

With all respect, the episode tells very little. The department's reprieve appears to have turned on an analysis of Hayes's statements as to what he perceived. *See* Plaintiff's Exhibit 40, 2 J.A. E–4—E–8. Carr and Turner, as reasonable students of the record, could have reached different appraisals.

Of course one can imagine police conduct so egregious that superiors' complaisance could at least be powerful evidence of a preexisting policy. *See Kibbe v. City of Springfield*, 777 F.2d 801, 806 (1st Cir. 1985), *cert. granted*, 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986), *cert. dismissed*, 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir.1985), *cert. denied*, —— U.S. ——, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987). But this is plainly no such case. It is true that to find a violation of Parker's Fourth Amendment rights, the jury had to conclude that Parker was the victim of an unreasonable seizure. But the jury's exoneration of the District on the assault and battery claim entailed the opposite finding—that Hayes had not used unreasonable force under the circumstances. Jury Instructions, Tr. 2220. In response to the district's motion for J.N. O.V., the district court sought to reconcile these findings by suggesting that the jury might have found the shooting unreasonable in an absolute sense, but Hayes' actions reasonable given his lack of adequate training. *Parker v. Hayes*, C.A. No. 83–3382 (D.D.C. Jan. 29, 1987) (Mem.Op.) at 6–7 n. 5. Whatever credence one may give this imaginative reconstruction,[3] it seems

---

**3.** The court's refusal to grant a judgment N.O.V. based on the inconsistency of the jury's verdicts is not before us as an independent claim of error, but it seems plain that the district court's attempted reconciliation presupposes far more refined notions of tort law than exist. While a police officer may be judged as "a reasonable police officer" rather than as a "reasonable person," there is simply no precedent for use of an ultra-subjective standard considering "a reasonable police officer with the specific amount of training this officer received." In any event, it seems fanciful to believe that the jury would, without aid from court or counsel, invent this distinction between § 1983 and common law liability standards. In fact, so far as reasonableness was concerned, the jury instructions for assault and battery were almost identical to those tendered for the § 1983 claim. *Compare* Tr. 2220 ("If you find that the use of that force used by Officer Hayes was unreasonable or ex-

plain that the jury did not regard Hayes's conduct as so egregious that it could infer deliberate indifference from the District's ultimate judgment call that he should not be penalized. As the jury clearly did not regard it as obvious that Hayes had used unreasonable force, his chiefs' similar judgment cannot be evidence of a preexisting policy of countenancing constitutional violations.

\* \* \*

Running a police department raises a variety of hard policy issues. The District may not have resolved each of these perfectly. But even if we assume training errors and a sufficient causal link between them and Parker's injury, there is simply no evidence—from a pattern of excessive constitutional violations or anything else— from which a jury could reasonably infer that its decisions reflected deliberate indifference to increased risks of such violations. The judgment N.O.V. ought to have been granted.

Even if there were sufficient evidence, the district court's failure to give the properly requested *Garner* charge was error and would require remand for a new trial.

cessive under the circumstances, you shall find the District of Columbia liable for assault and battery") with Tr. 2223 (to establish a constitutional violation on which to base his § 1983 claim, Parker must prove that he was injured "as a result of the unnecessary and unreasonable use of force by Officer Hayes"). Whatever affirmative defense Hayes's lack of training might have afforded on the common law claim, no such theory was argued and no instruction to that effect was tendered to the jury.

In its opinion, the district court attempts to distinguish this case from *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986). *See* Mem.Op. at 5–6. With all due respect, in so far as *Heller* is relevant to this case, it is on all fours. In *Heller*, also a § 1983 case, a jury had found the defendant police officer's actions not unreasonable and the officer not liable in the first half of a bifurcated trial. As the jury's finding eliminated the requi-

site constitutional infraction, the district court dismissed the action against the municipality as well and canceled the second half of the proceedings. The court of appeals reversed, holding that the verdict in favor of the policeman did not preclude a verdict against the city on an inadequate training theory. *Heller v. Bushey*, 759 F.2d 1371, 1373–74 (9th Cir.1985). It found, in an argument almost identical to that made by the district court here, "that the jury could have believed that [the policeman], having followed Police Department regulations, was entitled in substance to a defense of good faith." *Id.* at 1373. The Supreme Court, on appeal, disagreed. Because the jury was not charged on any good faith affirmative defense theory, the court of appeals could not employ such a theory to discount the verdict of exoneration. *City of Los Angeles v. Heller*, 475 U.S. at 798–99, 106 S.Ct. at 1572–73.