**Harold DORMAN as Personal Representative of the Estate of Benny Washington, Deceased**

v.

**DISTRICT OF COLUMBIA, Appellant.**

No. 88–7213.

United States Court of Appeals, District of Columbia Circuit.

Argued April 13, 1989.

Decided Oct. 27, 1989.

---

Donna M. Murasky, with whom Frederick D. Cooke, Jr. and Charles L. Reischel, Washington, D.C., were on the brief for appellant.

Marc Fiedler, with whom Patrick M. Regan and Charles T. Smith, Washington, D.C., were on the brief for appellee.

Before RUTH B. GINSBURG, SENTELLE, Circuit Judges, and RE,* Chief Judge.

Opinion for the Court filed by Chief Judge RE.

* Of the United States Court of International

RE, EDWARD D., Chief Judge:

Defendant-appellant, the District of Columbia (District), appeals from an order of the United States District Court for the District of Columbia denying its motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial. This court concludes that the evidence presented was insufficient to justify submission of the case to the jury. We therefore reverse the district court's judgment for plaintiff and remand the case with instructions to enter judgment for defendant in accordance with defendant's motion for judgment n.o.v.

## I. BACKGROUND

On December 16, 1984, Benny Washington, a 19–year–old male, committed suicide by hanging himself while detained in the Central Cellblock of the District's Metropolitan Police Department (MPD). Early that morning, Officer Wayne Lee Nicholson, a member of the MPD, observed Washington chasing a newspaper distributor with a knife. Officer Nicholson arrested Washington on charges of assault with a deadly weapon. Officer Nicholson testified that at the time of the arrest, Washington did not physically threaten him or act in a menacing way, but cooperated fully. Officer Nicholson brought Washington to the Fifth District police precinct, arriving shortly before 8:00 a.m.

Officer Nicholson testified that during the booking process, which took approximately an hour and a half, Washington "fell asleep a couple times." Record at 72, *Dorman v. District of Columbia*, No. 85–3587 (D.D.C.1988). Officer Nicholson further testified that when he asked Washington if there was anything wrong, Washington replied that "he'd been up all night and he was just tired." *Id.*

The booking process included a check on the "WALES" computer, which discloses whether a person has been arrested previously in the District and whether the individual has attempted suicide while in custody. The "WALES" system check showed

Trade, sitting pursuant to 28 U.S.C. § 293(a).

that although Benny Washington had been arrested previously, he had not attempted suicide.

Upon completion of the booking process, Washington was transported to the MPD's Central Cellblock. He was "logged in" by Officer Warren W. Snider. In accordance with MPD policy, Officer Snider searched Washington, put him through a metal detector, and removed his personal belongings. At approximately 10:50 a.m., Washington was placed in a cell. According to MPD policy, all the cells are checked every half hour. Pursuant to this policy Officer Snider checked all the cells at 11:20 a.m., 11:50 a.m., and 12:16 p.m. During the 12:16 p.m. check, Officer Snider found that Washington had hung himself with his jacket from the bars of his cell.

Harold Dorman, as representative of the estate of his brother, Benny Washington, sued under 42 U.S.C. § 1983. Dorman alleged that the District had violated Washington's eighth amendment right to be free from cruel and unusual punishment by failing to train its police officers to recognize potential suicide victims and to prevent suicides.

The case was tried before a jury, which rendered a verdict in Dorman's favor and awarded him $300,000 in compensatory damages. The District moved for judgment notwithstanding the verdict. In the alternative, based on alleged errors at trial, the District requested a new trial. The District denied the existence of any constitutional right to be protected by the police from self-destruction. The District also contended that, even if such a right exists, the evidence adduced at trial shows that "no reasonable juror could have concluded that the District of Columbia in December 1984, was deliberately indifferent or recklessly disregarded the safety and well-being of the persons it took into custody in the Central Cell Block." Memorandum in Support of Motion of Defendant District of Columbia for Judgment Notwithstanding the Verdict at 10, *Dorman* (No. 85–3587).

Denying the District's motion, the court held that "a pretrial detainee is constitutionally protected under the Eighth and Fourteenth Amendments from his own suicide." *Dorman*, No. 85–3587, slip op. at 8 (D.D.C. July 29, 1988). In particular, with respect to Benny Washington's death, the court stated:

Although not overwhelming, plaintiff's evidence on this issue [deliberate indifference to Washington's rights] withstands a motion for JNOV. Benny Washington had a constitutional right to be protected against his own suicide. Each of the MPD officers, however, testified that they had never received formal classroom training in recognition and prevention of custodial suicides.... Given this evidence, the jury could reasonably have inferred that the District's failure to train its officers in the area of suicide recognition and prevention amounted to deliberate indifference to Benny Washington's rights.

*Id.* at 14–15.

In reviewing a ruling on a motion for judgment n.o.v., federal appellate courts apply the same standard initially applied by the trial court. *See Morgan v. District of Columbia*, 824 F.2d 1049, 1056 (D.C.Cir. 1987). A judgment n.o.v. is appropriately entered when "there is only one reasonable conclusion to be drawn from the evidence and that conclusion is inconsistent with the verdict rendered." *Parker v. District of Columbia*, 850 F.2d 708, 711 (D.C.Cir.1988) (citing *Morgan*, 824 F.2d at 1056), *cert. denied*, ——U.S. ——, 109 S.Ct. 1339, 103 L.Ed.2d 809 (1989). The reviewing court should not weigh or reconsider the evidence, but should evaluate it "under the presumption that the jury resolved all factual disputes in favor of the prevailing party.... [The court's] function is limited to verifying 'only that fair-minded jurors could reach the verdict rendered.' " *Morgan*, 824 F.2d at 1056 (quoting *Grogan v. General Maintenance Serv. Co.*, 763 F.2d 444, 447 (D.C.Cir.1985)).

## II. DISCUSSION

Section 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the

District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1982).

In *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978), the Supreme Court revitalized section 1983 by holding that a municipality is a "person" within the meaning of that post-Civil War measure and therefore may be liable for its violation. *Monell*, however, also restricted municipal liability under section 1983 to cases in which "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S.Ct. at 2035–36. Furthermore, the Court stated that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691, 98 S.Ct. at 2036. The municipality or government entity is liable only "when execution of a government's policy or custom ... inflicts the injury...." *Id.* at 694, 98 S.Ct. at 2037.

In *City of Canton v. Harris*, — U.S. —, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Court reemphasized that "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *Id.* 109 S.Ct. at 1203 (emphasis in original). In short, a municipality can be liable under section 1983 only when its official policy is " 'the moving force [behind] the constitutional violation.' " *Id.* at 1205 (quoting *Monell*, 436 U.S. at 694, 98 S.Ct. at 2038).

■ In this case, plaintiff predicated the claim of liability under section 1983 on the city's alleged custom or policy of inadequately training its police officers on the prevention of suicide by pretrial detainees. This failing, plaintiff asserted, was the moving force behind Benny Washington's death. Plaintiff relied particularly on *Parker v. District of Columbia*, 850 F.2d 708 (D.C.Cir.1988), in which this court held that a municipality may be liable under section 1983 for deliberate indifference exhibited by a policy of inadequate training of its employees. *See id.* at 712.

In its decision denying the District's post-trial motions, the district court noted that the Supreme Court had not yet decided whether a municipality could be held liable under section 1983 for failure to train its police officers. The district court stated that "[u]ntil the [Supreme] Court rules, this Court is bound to follow our circuit's decision in *Parker* ...." *Dorman*, No. 85–3587, slip op. at 9 n. 9.

Subsequent to the issuance of the district court decision, the Supreme Court provided further guidance. In *City of Canton v. Harris*, — U.S. —, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Court adopted a high degree of fault and causation for cases such as the one presented here. In *Harris*, the plaintiff was a pretrial detainee. She brought a section 1983 action against a municipality alleging that the city inadequately trained its police in detecting when medical treatment is needed by an individual in police custody. That failing, she contended, violated her constitutional rights. *See Harris*, 109 S.Ct. at 1201. The plaintiff in *Harris* had fallen down several times following her arrest by the city's police department. When asked if she needed medical assistance, she responded incoherently; no medical assistance was given. *See id.* at 1200. After her release she was diagnosed as suffering from emotional ailments which required hospitalization and outpatient treatment. *See id.* at 1200–01.

The section 1983 complaint in *Harris* charged that the municipality had violated plaintiff's "right, under the Due Process Clause of the Fourteenth Amendment, to receive necessary medical attention while in police custody." *Id.* at 1201. The jury rendered a verdict for the plaintiff. Denying the city's motion for judgment n.o.v., the district court stated that the evidence showed that " 'the City of Canton had a

custom or policy of vesting complete authority with the police supervisor of when medical treatment would be administered to prisoners.'" *Id.* According to the district court, "'the jury could find from the evidence that the vesting of such *carte blanche* authority with the police supervisor without adequate training ... was grossly negligent or so reckless that future police misconduct was almost inevitable or substantially certain to result.'" *Id.*

On appeal, the Court of Appeals for the Sixth Circuit agreed that it was proper to submit the "failure to train" claim to the jury. The appellate court stated that, to prevail, plaintiff must prove "'that the lack of training was so reckless or grossly negligent that deprivations of persons' constitutional rights were substantially certain to result.'" *Id.* The court of appeals concluded, however, that the jury instructions might have led the jury to believe that it could find against the city under a *respondeat superior* theory. For that reason, the court of appeals reversed the judgment for Harris and remanded the case for a new trial. *See id.*

The Supreme Court vacated the judgment of the court of appeals. The Court ruled that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Harris,* 109 S.Ct. at 1204. In so ruling, the Court left no doubt that "deliberate indifference" requires a high degree of fault. As the *Harris* opinion clarifies, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* at 1205.

The Court also adopted a demanding standard of causation, stating that "for liability to attach ... the identified deficiency in a city's training program must be closely related to the ultimate injury." *Id.* at 1206. According to the Court, the question is whether the injury would "have been avoided had the employee been trained under a program that was not deficient in the identified respect[.]" *Id.*

In sum, the *Harris* decision plainly indicates that a municipality cannot be held liable under section 1983 in a detainee suicide case unless the inadequate police training alleged and proved rises to the level of a "deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 1204. Tested under *Harris,* the evidence in this case is clearly insufficient to support section 1983 liability.

The District's MPD training on suicide prevention is not so wanting that one could fairly characterize it as a "conscious choice" or "policy" of "deliberate indifference." The MPD officers are trained to recognize abnormal behavior and other signs that may indicate that an arrestee needs medical treatment or other safeguards. Both in a course at the Police Academy and in crisis intervention instruction at a local hospital, officers are taught about detecting abnormal behavior and suicidal tendencies. They are instructed to observe and to react appropriately to signs of abnormal behavior, such as "slurred speech, stumbling ..., withdrawal, hallucinations, [and] any kind of a phobia or fear that [might be exhibited]." Record at 17–18.

The evidence further reveals that the officers at the Central Cellblock, in particular, are trained to recognize abnormal behavior, and are instructed not to accept arrestees who are "injured" or "very violent," or who show signs of "mental illness or abnormal behavior." Record at 144. In accordance with police procedures, arrestees are searched and put through a metal detector before being taken to a cell. These procedures also require the officers to remove all objects that detainees might use to injure themselves or the officers, such as belts, shoestrings, and sharp objects. In addition, the officers are required to check the cells every 30 minutes.

Beyond the precautions described, and as earlier stated, the MPD utilizes a "WALES" computer system which contains information about previous arrests and su-

icide attempts of those previously in MPD custody. In situations in which suicidal tendencies are recognized, Central Cellblock officers are instructed to take certain steps, including shackling and closer supervision, to ensure that detainees are protected from themselves. These several safeguards refute the contention that the MPD had a policy of "deliberate indifference to the rights of persons with whom the police come into contact." *Harris*, 109 S.Ct. at 1204.

Plaintiff, in a letter brief submitted on April 6, 1989, contends that *Harris*, despite its square holding for the city, supports the jury verdict here because "the Court validated the standard of deliberate indifference articulated by this court in *Parker* ...." Letter Brief of Appellee at 3, *Dorman* (No. 88–7213). *Parker*, however, is hardly analogous to this case. *Parker* did not deal with protection against suicide or self-inflicted harm, but rather with a police officer's use of deadly force during the arrest of a suspect.

In *Parker*, a District of Columbia police officer shot and seriously injured the plaintiff while attempting to disarm and arrest him. In a section 1983 action brought against the District, Parker asserted that the District had failed "adequately to train, discipline and supervise its [police] officers in matters of extrajurisdictional arrest and disarmament." *Parker*, 850 F.2d at 710. The jury returned a verdict for the plaintiff, and the district court denied the District's motion for judgment n.o.v. *See id.*

On appeal, this court affirmed. From the record in *Parker*, this court found ample evidence that the District had been deliberately indifferent regarding the officers' training, and that the deficient training had caused the plaintiff's injuries. *See id.* at 714. As this court stated: "The unreasonable use of deadly force was an immediate cause of [Mr. Parker's injuries].... [Officer Hayes] resorted to use of his gun because he was unable physically to subdue Mr. Parker by less drastic means...." *Id.* The officer's "lack of physical conditioning and disarmament training," the court observed, demonstrated the District's "deliberate indifference," and was "a substantial factor in bringing about Mr. Parker's injuries." *Id.*

The Supreme Court in *Harris*, while firmly rejecting the section 1983 claim there presented, acknowledged that "it may happen that ... the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 109 S.Ct. at 1205. For example, the Court noted, because police officers are armed by the city and it is certain that they will be required to arrest fleeing felons, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* at 1205 n. 10 (citation omitted).

Plaintiff, in this case, contends that the MPD officers should have received a specific course on suicide prevention. The need for specific training in suicide prevention beyond what the officers received, however, in contrast to the need for training in the use of deadly force at issue in *Parker* and used as an example in *Harris*, is not "so obvious" that the city's policy may be characterized as "deliberately indifferent." Justice O'Connor, in her separate opinion in *Harris*, offered additional insight into what training is necessary. She stated that "it could be shown that the need for training was obvious" when a municipality failed "to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Id.* at 1209 (O'Connor, J., concurring in part and dissenting in part). The need for training as to the constitutional limitations on the use of deadly force by police officers is obvious, Justice O'Connor noted, because the failure to train "will create an extremely high risk that constitutional violations will ensue." *Id.* (O'Connor, J., concurring in part and dissenting in part). Surely, it cannot be said that a comparable "extremely high risk" was discernible in the case at bar. Furthermore, Justice O'Connor stated

that "municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of police discretion." *Id.* (O'Connor, J., concurring in part and dissenting in part).

In this case, there is no evidence of a *conscious choice* or a *policy* of deliberate indifference. It was not shown that "a pattern of constitutional violations" put the MPD on notice that its officers confront custodial suicides on a regular basis, and react "in a manner contrary to constitutional requirements." *Id.* at 1209 (O'Connor, J., concurring in part and dissenting in part). On the contrary, the record shows that Benny Washington's suicide was the first to have occurred in the Central Cellblock in the memories of Sergeant Norman E. Dye and Inspector James R. Lee, both officers assigned there for eight years. Thus, beyond genuine debate, there was no "pattern of violations from which a kind of 'tacit authorization' by city policymakers can be inferred." *Id.* (O'Connor, J., concurring in part and dissenting in part).

■ Furthermore, as earlier stressed, a section 1983 plaintiff must prove, in addition to a policy of deliberate indifference, a close causal nexus between "the identified deficiency in a city's training program" and "the ultimate injury." *Harris,* 109 S.Ct. at 1206. In this case there was no basis for finding the requisite causal connection between any training deficiencies and Benny Washington's suicide.

Plaintiff contends that if Officer Nicholson had been trained in custodial suicide prevention he would have recognized Benny Washington as a high risk for suicide. As plaintiff characterizes the episode in question, Washington was visibly drug intoxicated, and exhibited "mood swings" and bizarre behavior during his arrest and while he was in custody. Lindsay M. Hayes, plaintiff's expert in custodial suicide prevention, testified that two "red flags" should have alerted the officers that Washington was a potential suicide victim: (1) Washington's "unusual behavior at the time of his arrest," including his decision to halt in response to Officer Nicholson's command to halt, and (2) Washington's closing his eyes at the police station during lulls in the processing. *See* Record at 346–48. In its brief, plaintiff adds that as a "young, single male under the influence of drugs," Benny Washington showed several characteristics of the profile of a suicidal detainee. Appellee's Brief at 23, *Dorman* (No. 88–7213). Plaintiff contends that these factors would have alerted a properly trained police officer that Washington was at a high risk for suicide.

Our examination of the record satisfies us that Benny Washington's behavior cannot reasonably be termed "bizarre," nor was it sufficiently "abnormal" that an alert police officer would have found him to be suicidal. To halt when so commanded by a uniformed, armed police officer is neither bizarre nor abnormal even for someone engaged in an unlawful act. Similarly, Washington's falling asleep during processing would not suggest suicidal tendencies. When asked whether anything was wrong, Washington replied that "he'd been up all night and he was just tired." Record at 72. Surely, that was not a tip-off to the impending tragedy. Furthermore, though an MPD investigative report issued after the suicide revealed that Washington had PCP in his bloodstream at the time of his death, there is no evidence in the record that Washington appeared either intoxicated or under the influence of drugs at the time of his arrest or during his detention.

Washington's docile behavior in the presence of the police, his drowsiness during booking, and the fact that he was a "young, single male" hardly add up to a noteworthy indication of a suicide risk. This key question was framed by the Supreme Court in *Harris:* "Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" 109 S.Ct. at 1206. Even if the MPD officers had been better trained in custodial suicide prevention, we do not comprehend how the commonplace factors enumerated would have alerted the officers to the presence of a suicide risk and the need to take precau-

tions beyond those actually taken in this case.

Grasping at a slim reed, plaintiff cites *DeShaney v. Winnebago County Dep't of Social Servs.,* — U.S. —, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), as supportive of his claim. *DeShaney,* like *Harris,* rejected a section 1983 claim. The plaintiff in *DeShaney* was a child who had suffered permanent brain damage as a result of a series of severe beatings by his father. Several social workers had received complaints that the plaintiff was being abused by his father, and took some steps to protect him, but did not remove him from his father's custody. *See* 109 S.Ct. at 1001–02. The battered child sought compensation from the defendants, Winnebago County Department of Social Services and its social workers. *See id.* at 1002. The complaint alleged that the defendants had deprived the plaintiff "of his liberty without due process of law, in violation of his rights under the Fourteenth Amendment, by failing to intervene to protect him against a risk of violence at his father's hands. . . ." *Id.* The district court granted defendants' motion for summary judgment, and the Court of Appeals for the Seventh Circuit affirmed. That court held that the due process clause of the fourteenth amendment does not require a state to protect people from "private violence, or other mishaps not attributable to the conduct of its employees. . . ." 812 F.2d 298, 301 (7th Cir.1987).

On further review, the Supreme Court agreed with the lower courts. The defendants' failure to provide the plaintiff with adequate protection against his father's violence, the Court declared, did not violate his constitutional rights, because "the Due Process Clause does not require the State to provide its citizens with particular protective services. . . ." *DeShaney,* 109 S.Ct. at 1004.

The Court recognized in its discussion that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 1005. In *DeShaney* itself, however, that issue was not presented because the harm plaintiff suffered did not

occur while he was in public custody. *See id.* at 1006.

Plaintiff here stresses that, unlike the injuries afflicting the plaintiff in *DeShaney,* the harms Benny Washington suffered did occur while he was in custody. Furthermore, plaintiff notes that the court in *DeShaney* commented on *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), a case involving an involuntarily institutionalized mentally retarded plaintiff. In reference to *Youngberg,* the *DeShaney* Court said:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

109 S.Ct. at 1005–06.

We need not dwell on the argument drawn from *DeShaney.* It suffices to point out that, so far as this record shows, the District did not fail to provide for Washington's basic human needs and reasonable safety while in custody. As we earlier observed, MPD officers in fact took several precautions to prevent suicides. In sum, there can be no genuine doubt that the evidence in this case falls far short of meeting the high standards of fault and causation articulated in *Harris.* As the Supreme Court cautioned:

> In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell.* . . .

*Harris,* 109 S.Ct. at 1206 (citation omitted).

### CONCLUSION

The evidence presented was insufficient to justify submission of the case to the

jury. The district court's judgment entered on the verdict for plaintiff is therefore reversed, and the case is remanded with instructions to enter judgment for defendant in accord with defendant's motion for judgment n.o.v. This disposition renders moot defendant's alternate argument that errors made in the course of the district court proceedings warrant a new trial.